# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs May 15, 2012

## STATE OF TENNESSEE v. KHALEEFA LAMBERT

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 40900680     Michael R. Jones, Judge**

**No. M2011-01797-CCA-R3-CD - Filed March 4, 2013**

A Montgomery County Circuit Court Jury convicted the appellant, Khaleefa Lambert, of first degree premeditated murder; first degree felony murder; especially aggravated kidnapping by the use of a weapon; and especially aggravated kidnapping by the infliction of serious bodily injury. The trial court merged the murder convictions and imposed a sentence of life imprisonment in the Tennessee Department of Correction with the possibility of parole. The trial court also merged the especially aggravated kidnapping convictions and sentenced the appellant to eighteen years to be served consecutively to the murder conviction. On appeal, the appellant argues (1) that counts one, two, and three of the indictment should have been dismissed for failure to state an offense; (2) that the trial court erred by refusing to order the State to reveal grand jury testimony; (3) that the evidence was insufficient to sustain his murder convictions; and (4) that the trial court erred in sentencing. Upon review, we affirm the convictions and sentences. However, we vacate the judgments and remand the case to the trial court for entry of a single judgment reflecting the merger of the murder convictions and a single judgment reflecting the merger of the especially aggravated kidnapping convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Vacated; Case Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and THOMAS T. WOODALL, J., joined.

Roger E. Nell and Edward E. DeWerff, Clarksville, Tennessee, for the appellant, Khaleefa Lambert.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Steven Garrett and Samuel Knolton, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## I.  Factual Background

The grand jury returned a multi-count indictment against the appellant, charging him with the murder and kidnapping of his wife, eighteen-year-old Ashley Barnes.  At trial, the proof revealed that the victim was in the Army and was stationed at Fort Campbell, Kentucky.  On November 14, 2008, she married the appellant, and she was deployed to Jalalabad, Afghanistan, on December 18, 2008.

Clarksville attorney Adrian Bohnenberger testified that shortly before the victim was deployed, she contacted him about obtaining an uncontested divorce from the appellant.  A few weeks before the victim returned from overseas, the appellant called Bohnenberger and said he would not sign the divorce papers without being paid "a rather absurd" amount of money as compensation for the loss of support he was receiving from the Army.  Bohnenberger informed the appellant that the victim was trying to have the appellant's military support payments discontinued, and the appellant became agitated.  The appellant never indicated that he did not want to divorce the victim; he was merely concerned about the money he would receive.  After the appellant's refusal to sign papers for an uncontested divorce, the victim told Bohnenberger she wanted to pursue a contested divorce.

The victim's mother, Michelle Bosarge, testified that on February 28, 2009, the victim flew to Nashville and that Bosarge met her there.  They spent a few days together at Bosarge's home in Mobile, Alabama, and the victim left for Clarksville, Tennessee, on March 5, 2009, to pursue her divorce from the appellant.

Katelyn Rondeau and her boyfriend, Lavell Traylor, testified that on the night of Friday, March 6, 2009, the victim stayed at a Microtel Inn in Clarksville.  Rondeau, Traylor, Benita Gold, and a man named Nathaniel came to the victim's room, and they watched television and drank alcohol.  Rondeau and Traylor said that the victim never gave any indication that she might be having an extramarital affair.  However, she did express her desire to divorce the appellant.  While in the motel room, the victim received calls from the appellant on her cellular telephone.  The victim used the speakerphone feature, and Rondeau and Traylor heard the appellant beg the victim to not leave him.  Everyone in the motel room was intoxicated and laughed during the call.

Rondeau and Traylor estimated that they, Gold, and Nathaniel left the motel room sometime around 3:00 a.m. or 4:00 a.m.  The victim was planning to go to bed when they left.

Tiffany Almeyda, a friend of the appellant who lived in his apartment complex, testified that on the night of March 6, 2009, the appellant called and asked her to pick him up at a gas station in Clarksville. Brittany Randolph Gribble and Brittany Lester testified that they accompanied Almeyda. The appellant was in a good mood. When they arrived at the apartment complex around 1:00 or 2:00 a.m., the appellant asked if he could borrow Almeyda's white 2007 Mercury Mariner to visit his son, and Almeyda agreed. No knives or other weapons were in the vehicle at that time.

Jonathan Haynes, a front desk clerk at the Microtel Inn, testified that around 3:30 or 4:00 a.m., the appellant came into the lobby and asked for the victim's room number, saying that she was his wife and that he was trying to surprise her for their anniversary. Haynes refused, and the appellant offered Haynes twenty dollars to reveal the information. Haynes offered to call the victim's room to verify that the appellant was supposed to be there, but the appellant asked him to not do that because it would ruin the surprise. The appellant tried to look over the counter to see the registry or the computer. After his attempts to discover the victim's room number proved fruitless, he whispered, "[D]amn." The appellant paced in the lobby for about fifteen to thirty minutes, Haynes asked him to leave, and he left.

Army Lieutenant Shanda Garth, who acted as a liaison between deployed servicemen and servicewomen and their family members, testified that the appellant called her around 6:00 a.m. on March 7. The appellant had contacted Lieutenant Garth on previous occasions about support payments from the Army and to complain that the victim wanted to divorce him. Lieutenant Garth helped the appellant with financial matters but advised him that she could not help with personal matters. On the morning of March 7, the appellant told Lieutenant Garth that the victim was in a hotel with another man. Lieutenant Garth once again advised the appellant that she could not assist him with relationship matters. After a "pregnant pause," the appellant said, "[A]ll right, ma'am," and hung up. Lieutenant Garth denied she advised the appellant that he needed photographic proof of the victim's adultery.

Doris Henson testified that she arrived at the Microtel Inn around 5:30 or 6:00 a.m. on March 7, 2009, to relieve Haynes at the front desk. At 9:18 a.m., the victim, who was alone, checked out of the motel. Henson noticed that the victim had long, black hair that was "done up real pretty" and that she was talking on a cellular telephone. Henson did not see anyone running in the hallway of the motel that morning.

Brenda Stacey testified that around 9:00 a.m., she and her husband were driving by the Microtel Inn. Stacey saw a white sport utility vehicle (SUV) and the victim's car in the parking lot. A man ran in front of the SUV, grabbed a woman who was trying to get into her car, and shook her. The man was black, taller than the woman, thin, and had "close braids." The woman was shorter than the man and had shoulder-length dark hair. Stacey told her

husband to go to the motel because the man was hurting the woman, but her husband refused, saying there was nothing they could do. Stacey promised her husband that if she found out something had happened at that motel, she would not forgive him for refusing to go back.

Shawntika Majors, the mother of the appellant's son, testified that around 5:30 or 6:00 a.m. on the morning of March 7, 2009, she called the appellant and asked about babysitting while she went to work. During the call, the appellant sounded upset and said that he was going to speak with the victim at a motel. Majors advised the appellant to "let it go," and the call ended.

Thereafter, Majors, who was supposed to be at work around 8:00 a.m., repeatedly attempted to call the appellant. At approximately 8:45 or 9:00 a.m., the appellant returned her calls and told her to tell their son that the appellant loved him. Majors asked what had happened, and the appellant, who was crying, said that he "hurt her." Majors assumed the appellant was referring to the victim. Majors "heard something in the background like someone trying to catch their breath." Majors advised the appellant to go to the hospital, but he stated that "he was going to drive until he ran out of gas."

The appellant's sister, Shanesha L. Jackson, testified that a little after 9:00 a.m., the appellant called her. He was crying, told her that he loved her, and asked her to tell the rest of his family that he loved them. When Jackson asked what was wrong, the appellant responded that "he done messed up" and that he thought he had hurt the victim because he "cut her." Jackson inquired as to the victim's condition and whereabouts. The appellant said that the victim was "in the back," that he was talking to her, and that he was going to take her to the hospital. Jackson encouraged the appellant to take the victim to the hospital quickly and assured him that she would meet him at the hospital. When the appellant's cellular telephone started failing, he asked Jackson to call 911 to tell them he was in a white truck and that he was on his way to the hospital. Jackson's call with the appellant lasted approximately ten minutes.

Tennessee Highway Patrol Trooper Krystal Mathis testified that around 10:00 a.m., she was stationed on the westbound side of Interstate 24 near the 1.5 mile marker when she saw in her rearview mirror a white SUV swerve behind her police cruiser then pull back into traffic. Trooper Mathis activated her emergency equipment, and the SUV immediately pulled in front of the cruiser and parked. Trooper Mathis approached the SUV on the passenger side. At Trooper Mathis' instruction, the appellant, who was driving the vehicle, unlocked the passenger door. Trooper Mathis opened the door and saw the appellant's hand wrapped in a bloody towel or tissue. The appellant was crying. When Trooper Mathis asked why he was crying, the appellant said that he did not mean to "hurt her." Trooper Mathis asked to whom he was referring, and the appellant looked over his shoulder toward the rear

-4-

of the vehicle. Trooper Mathis then saw the body of a female in the back floorboard. The victim's head and upper body were behind the driver's seat, which "was pushed all the way back." Trooper Mathis asked the appellant what he had done to the victim. The appellant replied that the victim was cheating on him but that he did not mean to hurt her. Trooper Mathis tapped the victim's leg and spoke to her, but the victim was unresponsive. The appellant said that the victim was not dead and was only sleeping. Trooper Mathis obtained the appellant's identification and asked him to step out of the vehicle. She handcuffed the appellant and placed him in the back of the cruiser. Trooper Mathis did not see a weapon in the SUV.

While the appellant was in the back of the police car, he told Trooper Mathis that he saw the victim at a motel "all hugged up with a man." The appellant said that when he approached them, the man ran away. The appellant grabbed the victim and put her in the SUV. The appellant said that he had called the victim's lieutenant around 8:00 a.m. to report the victim was cheating on him and that the lieutenant advised him to obtain photographic proof of the affair.

Clarksville Police Sergeant Joe Difiore testified that he went to the Microtel Inn on March 7 to assist at the crime scene unit. Sergeant Difiore saw some dark red spots on the black pavement, which he believed were blood stains. Detective Tim Finley testified that he swabbed the stains for testing.

Clarksville Police Detective Alan Charvis testified that in the morning hours of March 7, he was informed of the incident on the interstate and that he went into the office of the Major Crimes Unit to begin gathering information. He learned that the appellant was in custody and had been transported to the hospital for treatment of his injuries. Detective Charvis obtained information about the victim and contacted her mother.

Detective Charvis had the SUV the appellant was driving, with the victim's body still inside, towed to a bay at the Major Crimes Unit's office. He learned that the appellant had borrowed the vehicle from Almeyda. Detective Charvis did not believe the victim was familiar with the vehicle.

Detective Charvis said that the victim's body was in the back floorboard of the vehicle, with her upper body behind the driver's seat. He noticed that the driver's seat "was pushed back and the seat back was laid back" over the victim's body. A knife blade was sticking out of the victim's neck; the broken handle from the knife was found near the seatbelts in the backseat.

Steve Scott with the Tennessee Bureau of Investigation (TBI) firearms and tool mark

identification unit testified that he examined the knife blade and determined that the blade was four inches long, was serrated on one edge, and was smooth on the other edge.

Detective Charvis testified that the victim's Chevrolet Cobalt was brought to a bay at the Major Crimes Unit's office. When it arrived, Detective Charvis discovered that the left rear tire of the vehicle was flat and that the tire had been punctured.

Scott testified that he examined the puncture and determined that the tire was cut by a blade similar to the one found in the victim's neck. However, he was unable to find sufficient individual characteristics to definitively link that knife to the cut tire.

Detective Charvis testified that he interviewed the appellant around 4:00 p.m. on March 7 and that he recorded the interview. During the interview, the appellant said that he and the victim met on the Internet site, Myspace. They were together approximately seven months before her death. He said that on March 6, the victim came to his house, and they talked. The next morning, he went to the motel after speaking with Lieutenant Garth. The appellant maintained that he had repeatedly complained about the victim having an affair and that Lieutenant Garth had advised him that he needed proof of adultery, such as photographs or an audio recording. The appellant said that he went to the motel but denied flattening the victim's tire. The appellant saw the victim and a black man "hugged up" in a hallway leading out of the motel. The appellant said that he was 6'3", the victim was 5'5", and the man was approximately 5'9" with a "low haircut." The appellant advanced on the victim, and the man ran. The appellant grabbed the victim and put her in the SUV. He stabbed her with a kitchen knife he found in the SUV and thought he must have cut his hand on the knife. The appellant could not recall if he stabbed the victim in the parking lot or inside the SUV. He drove away from the motel and got on the interstate headed toward Kentucky. He talked to the victim while he drove. Outside of Fort Campbell, he called 911 to report that he was on the way to the hospital with the victim. However, the battery of his cellular telephone died, and he was unable to convey the information. When he saw Trooper Mathis, he pulled over in front of her and told her, "I hurt my wife." The appellant said that he thought he stabbed the victim but that he could not completely remember. He said that "it was like a blank in and blank out." The appellant confirmed that he called his sister and that he asked the motel clerk to disclose the victim's room number. The appellant stated that he might have "just snapped."

Army Sergeant Toney McClelland, who was stationed in Afghanistan with the victim, testified that he never saw any indication that the victim was engaging in an extramarital affair. Additionally, the victim's stepfather, Howard Bosarge, testified that he was in Afghanistan at the same time as the victim, that he saw her on a daily basis, and that he never saw evidence of an affair.

Forensic pathologist Dr. Thomas Deering testified that he performed an autopsy on the victim's body and discerned that the victim's death was caused by multiple sharp force injuries consisting of stab wounds, incised wounds, and "flick marks." The victim had an incised wound to the top right of the head that fractured the outer surface of the skull and another incised wound to the right index finger. There were stab wounds behind, below, and in front of the ear; to the left side of the neck above the collarbone; and near the right wrist. There were two additional sharp force injuries to the right side of the neck and "flick marks" to the abdomen. These wounds would have been painful but not fatal. However, two wounds were potentially fatal. One of the potentially fatal wounds was a 4" deep stab wound to the abdomen that cut the loop of the small bowel, went through the mesentery of the bowel, and cut the inferior vena cava. The wound would have been fatal within days if not treated. Additionally, a knife blade was embedded 4 1/4" to 4 1/2" in the right side of the neck. The wound incised the right internal carotid artery, went behind the trachea and esophagus, and came out in front of the left vertebral artery. The wound was fatal, causing heavy bleeding that would have led to death in minutes. Dr. Deering could not specifically say how long the victim had lived but estimated that it could have been between five and twenty-five minutes but not as long as an hour. He also did not know if the location of the wound would have rendered the victim speechless. He said that the victim would have been conscious and capable of movement until blood loss eventually rendered her unconscious.

TBI Special Agent Jennifer Shipman with the serology/DNA laboratory testified that she tested three of four swabs taken from the motel parking lot. All of the swabs were consistent with the appellant's blood. Agent Shipman also tested the victim's underwear and found spermatozoa that matched the appellant's DNA, which she explained was consistent with the victim and the appellant having sexual intercourse within seventy-two hours prior to the victim's death.

The jury found the appellant guilty of first degree premeditated murder, first degree felony murder, especially aggravated kidnapping by the use of a weapon, and especially aggravated kidnapping by the infliction of serious bodily injury. The trial court merged the first degree murder convictions and imposed a sentence of life imprisonment with the possibility of parole. The trial court merged the especially aggravated kidnapping convictions and sentenced the appellant to eighteen years. The court further ordered the sentences to be served consecutively. On appeal, the appellant contends that the indictment charging him with especially aggravated kidnapping and felony murder did not state an offense, that the trial court erred by refusing to order the State to disclose the testimony presented to the grand jury, that the evidence was insufficient to support his murder convictions, and that the trial court erred in sentencing.

## II. Analysis

### A. Indictment

As his first issue, the appellant contends that the trial court should have dismissed the especially aggravated kidnapping charges and the felony murder charge because the indictment failed to state an offense. Specifically, he argues that each charge omitted an essential element of the offense alleged.

The Sixth and Fourteenth Amendments to the United States Constitution and article I, section 9 of the Tennessee Constitution afford an accused the right to be informed of the nature and cause of the accusation against him or her. See State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997). Generally, a charging instrument is valid if the information contained therein "provides sufficient information (1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." Hill, 954 S.W.2d at 727. With the decline of common law offenses and the advent of statutory offenses, strict pleading requirements are no longer necessary. Id. at 727-28. "Hill and its progeny leave little doubt that [charging instruments] which achieve the overriding purpose of notice to the accused will be considered sufficient to satisfy both constitutional and statutory requirements." State v. Hammonds, 30 S.W.3d 294, 300 (Tenn. 2000). Moreover, "specific reference to a statute within [a charging instrument] may be sufficient to place the accused on notice of the charged offense." State v. Sledge, 15 S.W.3d 93, 95 (Tenn. 2000); see also State v. Carter, 988 S.W.2d 145, 149 (Tenn. 1999).

### 1. Especially Aggravated Kidnapping

First, we will examine the especially aggravated kidnapping charges. Tennessee Code Annotated section 39-13-305 provides:

> (a) Especially aggravated kidnapping is false imprisonment, as defined in § 39-13-302:
>
> (1) Accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon; [or]
>
> . . . .
>
> (4) Where the victim suffers serious bodily injury.

Tennessee Code Annotated section 39-13-302 provides that "[a] person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty."

Count one of the indictment charged

[t]hat on the 7th of March 2009, and in the State and County aforesaid, [the appellant] unlawfully, feloniously and knowingly did remove or confine [the victim], and said removal or confinement was accomplished by the use and display of a knife as a deadly weapon, in violation of [Tennessee Code Annotated section] 39-13-305 and against the peace and dignity of the State of Tennessee.

Count two provided:

And the Grand Jurors aforesaid, upon their oath aforesaid, do further present and say that on the date aforesaid, and in the State and County aforesaid, [the appellant] unlawfully, feloniously and knowingly did remove or confine [the victim] and she suffered serious bodily injury, in violation of [Tennessee Code Annotated section] 39-13-305 and against the peace and dignity of the State of Tennessee.

The appellant maintains that the foregoing charges fail to allege that the confinement interfered substantially with the victim's liberty. This court has previously stated that a defendant may be sufficiently on notice of the crime charged "even when an element of the offense is omitted so long as there is a statutory reference to the crime." State v. Ricky Eugene Cofer, No. E2000-01499-CCA-R3-CD, 2001 WL 708841, at *3 (Tenn. Crim. App. at Knoxville, June 25, 2001). For example, our supreme court has previously held that an indictment which fails to specifically provide a mens rea for the charged offense is sufficient if it specifically references the statute which provides the mens rea for the offense. See State v. Wilson, 31 S.W.3d 189, 192 (Tenn. 2000); Ruff v. State, 978 S.W.2d 95, 99 (Tenn. 1998). In the instant case, the charges in the indictment clearly reference the appropriate statute, Tennessee Code Annotated section 39-13-305, which in turn references Tennessee Code Annotated section 39-13-302 that defines false imprisonment as the unlawful and knowing removal or confinement of another "so as to interfere substantially with the other's liberty." See State v. John Allen Chapman, No. 01C01-9604-CC-00137, 1997 WL 602944, at *5 (Tenn. Crim. App. at Nashville, Sept. 30, 1997). Therefore, we conclude that the appellant was sufficiently charged with the offense of especially aggravated kidnapping.

## 2. Felony Murder

The appellant alleges that the indictment charging him with felony murder omitted "the element that he must have intended to kidnap" the victim. Felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . kidnapping." Tenn. Code Ann. § 39-13-202(a)(2). Count three of the indictment provided:

> And the Grand Jurors aforesaid, upon their oath aforesaid, do further present and say that on the date aforesaid, and in the State and County aforesaid, [the appellant] unlawfully, feloniously, knowingly and recklessly did kill [the victim], committed in the perpetration of a felony, to-wit: Kidnapping, in violation of [Tennessee Code Annotated section] 39-13-202(a)(2) and against the peace and dignity of the State of Tennessee.

The indictment tracked the language of the felony murder statute. Further, by referencing kidnapping, the appellant was put on sufficient notice of the offense. See Sledge, 15 S.W.3d at 95. This issue is without merit.

## B. Grand Jury Testimony

As his next issue, the appellant contends that "[t]he trial court erred by not requiring the State to reveal the testimony of all grand jury witnesses to ascertain whether such witnesses' grand jury testimony was consistent with that given by such witnesses at trial."

At a hearing on February 8, 2011, the court asked defense counsel why he was requesting grand jury testimony. Defense counsel replied, "[W]e always like to have whatever statements were made by whatever witnesses are out there come time for trial, which is the design of the rule to ascertain whether witnesses made inconsistent statements in another forum." Defense counsel proposed a procedure, which he acknowledged was "not sanctioned by rule or case law," for the defense to obtain grand jury testimony. Defense counsel said:

> In any event, I think the first step would be to ascertain who testified in front of the Grand Jury. Step number two would be does that person or persons – are they going to be called to testify at trial? If that's no, then, of course, there's no reason to go any further. If that person or persons are to testify at trial, then we're stuck with the quandary of what to do about

-10-

that.

The court observed that Detective Charvis was the only witness listed on the indictment and asked the State to ascertain the witness(es) who testified before the grand jury before the court ruled on the issue.

At a hearing on February 17, 2011, defense counsel asked if Detective Charvis was the sole witness at the grand jury proceeding. The State responded that it was "ninety-nine[] point ninety[-]nine percent sure that he's the only witness that would have testified to the grand jury." Thereafter, defense counsel requested that the trial court "allow the defense to get to his testimony at the grand jury . . . [possibly by] allowing the [d]efense to speak to one or two members of the grand jury to see if they can recall what Detective Charvis' testimony was." The court responded, "Without some special reason being given to me for need of that, I am not going to allow that."

Generally, with limited exceptions, grand jury proceedings are to remain secret. State v. Carruthers, 35 S.W.3d 516, 533 (Tenn. 2000); State v. Penley, 67 S.W.3d 828, 833 (Tenn. Crim. App. 2001). Specifically, Rule 6(k) of the Tennessee Rules of Criminal Procedure provides:

> (1) Grand Jury Proceedings Secret. Every member of the grand jury shall keep secret the proceedings of that body and the testimony given before it, except as provided in Rule 6(k)(2).
>
> (2) Exception to Rule of Secrecy. The court may require a grand juror to reveal the testimony of a grand jury witness:
>
> (A) to ascertain whether the grand jury testimony is consistent with that given by the witness before the court; or
>
> (B) to disclose the grand jury testimony of any witness charged with perjury.

See also Tenn. Code Ann. §§ 40-12-209, -210.

Typically, "an accused seeking disclosure [of grand jury testimony] must demonstrate a particularized need for the materials sufficient to outweigh the policy in favor of secrecy." 22A C.J.S. Criminal Law § 750 (2012). "An allegation of possible inconsistencies, or speculation as to inconsistencies in the testimony of other witnesses without specific reference to those alleged inconsistencies will not be adequate to show particularized need."

Id.

In the instant case, the appellant requested the testimony presented to the grand jury but did not provide any particularized need for the testimony. Therefore, we agree with the trial court that the appellant was not entitled to question grand jurors about the testimony of grand jury witnesses. See Shawn Kelly v. State, No. W2004-02211-CCA-R3-PC, 2005 WL 1812289, at *10 (Tenn. Crim. App. at Jackson, Aug. 1, 2005).

## C. Sufficiency of the Evidence

The appellant also challenges the sufficiency of the evidence sustaining his murder convictions. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

## 1. First Degree Premeditated Murder

In order to obtain the appellant's conviction for first degree premeditated murder, the State was required to prove, beyond a reasonable doubt, that the appellant committed the "premeditated and intentional killing of [the victim]." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation "is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself. [However,] [i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Id. at (d). Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon certain circumstances to infer premeditation. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Specifically, the following factors have been used to support a jury's inference of premeditation: (1) the appellant's prior relationship to the victim which might suggest a motive for the killing; (2) the appellant's declarations of intent to kill; (3) the appellant's planning activities before the

-12-

killing; (4) the manner of the killing, including the appellant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; (5) the appellant's demeanor before and after the killing, including a calm demeanor immediately after the killing. See Pike, 978 S.W.2d at 914-915; State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Gentry, 881 S.W.2d 1, 5 (Tenn. Crim. App. 1993).

The appellant argues that "this was a crime of passion" that was not committed "'after the exercise of reflection and judgment.'" However, in the light most favorable to the State, the proof reveals that the victim returned from serving overseas to institute divorce proceedings against the appellant, and the appellant called the victim's attorney, complained about the loss of benefits, and demanded money. While the victim was at the motel, the victim spoke with the appellant via telephone. During the conversation, the appellant begged the victim to not end the relationship. When she refused, the appellant went to the motel and attempted to learn the victim's room number by telling the desk clerk a fictional reason for seeing the victim, by attempting to bribe the desk clerk, and by trying to see the list of motel guests on the computer or registry. The appellant borrowed an SUV that the victim had never seen and waited for her in the motel parking lot. No weapons were in the SUV prior to the appellant's taking possession of the vehicle. A knife consistent with the knife used to kill the victim was used to puncture a tire on the victim's car. When the victim came out of the hotel and tried to get into her car, the appellant ran behind her, grabbed her, shook her, and put her in the SUV. The appellant stabbed her multiple times and inflicted two potentially fatal wounds, one to the victim's abdomen and one to her neck. The knife blade broke off in the victim's neck, and the appellant left the handle of the knife in the backseat of the SUV. The victim was placed in the floorboard behind the driver's seat, and the seat was pushed against the victim's body. The appellant called Jackson and Majors and, believing the victim was still alive, refused to take her to the hospital. We conclude that the jury could have reasonably concluded from the foregoing that the appellant premeditated his actions and intended to kill the victim.

Turning to the appellant's felony murder conviction, we note that felony murder, as charged in the instant case, is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . kidnapping." Tenn. Code Ann. § 39-13-202(a)(2). In order to constitute felony murder, "a killing must have been 'done in pursuance of the unlawful act, and not collateral to it. . . . [In other words,] [t]he killing must have had an intimate relation and close connection with the felony . . . and not be separate, distinct, and independent from it.'" State v. Banks, 271 S.W.3d 90, 140 (Tenn. 2008) (quoting State v. Rice, 184 S.W.3d 646, 663 (Tenn. 2006)). "The killing 'may precede, coincide with, or follow the felony and still be considered as occurring "in the perpetration of" the felony offense, so long as there is a connection in time, place, and continuity of action.'" State v.

Thacker, 164 S.W.3d 208, 223 (Tenn. 2005) (quoting State v. Buggs, 995 S.W.2d 102, 106 (Tenn. 1999)). "'[A] jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing.'" State v. Kiser, 284 S.W.3d 227, 286 (Tenn. 2009) (quoting Buggs, 995 S.W.2d at 108).

The appellant argues that "[t]he State did not prove beyond a reasonable doubt that the 'killing and the felony [were] closely connected in time place, causation, and continuity of action." We disagree. The proof reflects that the victim checked out of the motel at 9:18 a.m., and that around 10:00 a.m., Trooper Mathis encountered the appellant. Within that space of time, the appellant removed the victim from the parking lot, stabbed her multiple times, and drove around while she died in the back floorboard. Dr. Deering said that the victim would have died between five minutes to half an hour after the wounds were inflicted. We conclude that a jury could have found the appellant guilty of felony murder.

## D. Sentencing

As his final issue, the appellant challenges the length of his especially aggravated kidnapping sentences and the trial court's imposition of consecutive sentencing. Previously, appellate review of the length, range, or manner of service of a sentence was de novo with a presumption of correctness. See Tenn. Code Ann. § 40-35-401(d). However, our supreme court recently announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence(s). See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the

general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. "[A]ppellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." Id. at 345-46. "[They are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

At the sentencing hearing, neither party put on proof. The court noted the merger of the especially aggravated kidnapping convictions and the murder convictions, which resulted in one especially aggravated kidnapping conviction and one murder conviction. The court stated that it was considering the evidence adduced at the trial and sentencing hearings, the principles of sentencing, the nature and characteristics of the criminal conduct involved, and the statistical information provided by the Administrative Office of the Courts. The court further noted that it would consider the late-filed presentence report. The court stated that during trial, it learned the appellant was on bail at the time of the instant offenses. Accordingly, the trial court applied enhancement factor (13)(A). See Tenn. Code Ann. § 40-35-114(13)(A). The trial court found no mitigating factors and sentenced the appellant to consecutive sentences of eighteen years for the especially aggravated kidnapping conviction and to life with the possibility of parole for the murder conviction.

The appellant argues that the trial court erred by applying enhancement factor (13)(A),that the felony was committed while the appellant was released on bail if he was ultimately convicted of the prior misdemeanor or felony. The appellant maintains that

although he was on bail for a "domestic" offense at the time of the instant offenses, that charge was dismissed by the State at the conclusion of the sentencing hearing. Therefore, the appellant was never convicted of the offense for which he was on bail. The State concedes the error but argues the trial court nevertheless correctly sentenced the appellant based upon the principles and purposes of sentencing. We agree with the State. See Bise, 380 S.W.3d at 702; Tenn. Code Ann. §§ 40-35-102(1), (3)(A); 40-35-103(1)(B), (2), (4), (5).

The appellant further contends that the trial court should have applied mitigating factor (11), that the appellant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct. Tenn. Code Ann. § 40-35-113(11). The appellant argues that he committed a crime of passion and did not have a sustained intent to violate the law. However, the proof demonstrates otherwise. Over the course of several hours, the appellant spoke with the victim on the telephone, tried to discover her room number to "surprise" her, obtained a vehicle she did not recognize, armed himself with a knife, punctured a tire on her car, lay in wait for her, kidnapped her, stabbed her, and drove around until she died. Therefore, we agree with the trial court that there were no mitigating factors applicable to the appellant's especially aggravated kidnapping sentence. We conclude that given the foregoing considerations, the trial court did not err by imposing an eighteen-year sentence for the especially aggravated kidnapping conviction.

The appellant also argues that the trial court erred by finding that he was a dangerous offender and ordering him to serve his sentences for murder and especially aggravated kidnapping consecutively. Specifically, the appellant maintains that ordering him to serve an eighteen-year sentence in addition to his life sentence does not further protect society or relate to the severity of the offenses, noting that he would be seventy-nine years old at his first opportunity for parole on the life sentence.

Generally, "[w]hether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court." State v. Adams, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997). Tennessee Code Annotated section 40-35-115(b) contains the discretionary criteria for imposing consecutive sentencing. See also State v. Wilkerson, 905 S.W.2d 933, 936 (Tenn. 1995). The trial court may impose consecutive sentencing upon finding the existence of any one of the criteria. In the instant case, the trial court found that the appellant was a dangerous offender. Tenn. Code Ann. § 40-35-115(b)(4). Our case law clearly reflects that in order to impose consecutive sentencing based upon finding that a defendant is a dangerous offender, a court must also find that "(1) the sentences are necessary in order to protect the public from further misconduct by the defendant and [that] (2) 'the terms are reasonably related to the severity of the offenses.'" State v. Moore, 942 S.W.2d 570, 574 (Tenn. Crim. App. 1996) (quoting Wilkerson, 905 S.W.2d at 938); see also State

v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

The trial court found that the appellant's

> behavior indicated absolutely no regard for human life and he
> had no hesitation about committing crimes in which the risk to
> human life was exceedingly high.
>
> . . . .
>
> The facts of this case were [the appellant] had gotten out
> of jail, borrowed a car, went to where he knew [the victim] was,
> tried to get into the room, couldn't so he basically waited until
> she came out, having flatten[ed] her tire, kidnapped her, took
> her away from the scene, stabbed her multiple, multiple times.

The court further found that the Wilkerson factors were satisfied. We agree. The record reflects that the appellant, unhappy with the impending divorce, tried to learn the victim's room number by lying and by surreptitious means. Unsuccessful, he armed himself with a knife, flattened the victim's tire, and covertly waited for her in the parking lot. When she tried to get into her car, the appellant snuck up behind her, grabbed her, and stabbed her multiple times, once with enough force that the knife blade broke off in her neck. After the stabbing, the appellant drove around in the borrowed SUV with the victim lying in the back floorboard with the driver's seat pressed back into her. Although the appellant's sister and his son's mother urged him to take the victim to the hospital, he refused and kept her in the vehicle until she died. We conclude that the trial court did not abuse its discretion in imposing consecutive sentencing.

We note that the trial court entered separate judgments for both of the appellant's convictions for murder and for both of his convictions for especially aggravated kidnapping. Although the judgments note a merger of the convictions, the court should have entered only one judgment of conviction for murder and one judgment for especially aggravated kidnapping, noting the merger of the counts. See State v. Howard, 30 S.W.3d 271, 274 n.4 (Tenn. 2000); State v. William F. Cartwright, No. M2003-00483-CCA-R3-CD, 2004 WL 1056064, at *6 (Tenn. Crim. App. at Nashville, May 10, 2004). Therefore, we must remand the case for entry of a judgment of conviction for the murder conviction and a judgment of conviction for the especially aggravated kidnapping conviction.

### III. Conclusion

In sum, we conclude that the trial court did not err in refusing to dismiss the counts one, two, and three of the indictment, refusing to make the State disclose grand jury testimony, or in sentencing the appellant. Moreover, we conclude that there is sufficient evidence to sustain the appellant's convictions. Accordingly, we affirm the convictions and sentences but vacate the judgments and remand the case to the trial court for correction of the judgments.

_____
NORMA McGEE OGLE, JUDGE